UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

CHERYL STEWART, RADHICA PARSARAM,  :
RAFAEL CASTRO, ROGER WAGNER,        :
MALCOLM CARRINGTON, VERNON WELLS,  :
HAZEL CLARK, WAYNE DORSET, AND     :        REPORT &
MERVYN DYER,                        :        RECOMMENDATION
                                    :        18-CV-2283 (MKB) (SMG)
                Plaintiffs,         :
                                    :
        -against-                   :
                                    :
LORING ESTATES LLC, LORING ESTATES  :
HOMEOWNERS ASSOCIATION CORP.,       :
KONDAUR CAPTIAL CORPORATION, NORTH  :
SHORE INVESTORS REALTY GROUP, LLC, PI-NC, :
LLC, 609 EMERALD STREET LLC,        :
THOMAS KONTAGIANNIS, LORENZO        :
DELUCA, AND ALAN WEINREB,           :
                                    :
                Defendants.[1]      :
                                    :

-------------------------------------------------------------------- x

GOLD, STEVEN M., U.S. Magistrate Judge:

## INTRODUCTION

On April 18, 2018, plaintiffs Cheryl Stewart, Radhica Parsaram, Rafael Castro, Roger

Wagner, Malcolm Carrington, Vernon Wells, Hazel Clark, Wayne Dorset, and Mervyn Dyer,

proceeding *pro se*, commenced this action against nine defendants: Loring Estates LLC ("Loring

Estates"), Loring Estates Homeowners Association Corp. ("Loring Estates HOA"), Kondaur

Capital Corporation ("Kondaur"), North Shore Investors Realty Group, LLC ("North Shore"),

PI-NC, LLC ("PI-NC"), 609 Emerald Street LLC ("609 Emerald Street"), Thomas Kontogiannis,

Lorenzo Deluca, and Alan Weinreb, alleging breach of contract and fraud in connection with the

---

[1] For the sake of brevity, this Report uses the caption from the original Complaint. The caption for the Amended Complaint lists dozens of parties, and the Report discusses those parties in greater detail below.

sale to them of residential properties located in Brooklyn, New York.  Compl., Dkt. 1.  One

month later, on May 18, 2018, United States District Judge Margo K. Brodie dismissed

plaintiffs' Complaint for lack of subject matter jurisdiction; in light of plaintiffs' *pro se* status,

though, Judge Brodie granted plaintiffs leave to file an amended complaint.  Mem. & Order

dated May 18, 2018, Dkt. 7.  With respect to subject matter jurisdiction, Judge Brodie held that

(1) the parties were not completely diverse, as it appeared that "all [p]laintiffs and all but one

[d]efendant [we]re domiciled in New York," and (2) the case did not arise under a federal

question because plaintiffs appeared to allege only state law claims sounding in breach of

contract and fraud.  *Id.* at 5.

Thereafter, on December 21, 2018, plaintiffs filed a 577-page Amended Complaint

alleging a RICO claim as well as claims for breach of contract and fraud under New York law.

Am. Compl., Dkt. 17.[2]  Plaintiffs also named 56 new defendants[3] and two new plaintiffs—Fred

Harry and George Wagner—in the Amended Complaint.  The caption of the Amended

---

[2]  Citations to the Amended Complaint throughout this Report are to page numbers, not paragraph numbers, because the paragraphs in the amended pleading are not consecutively numbered throughout; for example, paragraph 106 on page 149 is followed by paragraph 1 on page 152.

[3]  The new defendants include: (1) Chicago Title Insurance Company ("Chicago Title"), (2) Fidelity Title Insurance Company ("Fidelity Title"), (3) HSBC Bank, USA, N.A., (4) Mortgage Electronic Registration System Inc. ("MERS"), (5) JPMorgan Chase, N.A., (6) Deutsche Bank National Trust Co., (7) Select Portfolio Servicing, (8) U.S. Bank, N.A., (9) Option One Mortgage Corporation, (10) H & R Block Bank, (11) H & R Block Bank, FSB, (12) United General Title Insurance Company, Inc., (13) United States of America Through the Internal Revenue Service ("IRS"), (14) El Equity LLC, (15) LaSalle Bank, (16) Letom Management LLC, (17) Bank of America, N.A., (18) Washington Title Insurance Company, Inc., (19) Vak M8 Fund, LLC, (20) Plaza Real Estate Holdings Inc. (listed twice), (21) GRP Loan, LLC, (22) Karib Credit LLC, (23) N.Y.C. Department of Buildings, (24) N.Y.C. Department of Transportation, (25) Triumph Abstract, Inc., (26) First North American Abstract & Settlement Corp., (27) Stout Street Funding LLC, (28) Halifax Group, LLC, (29) Griffon Loring, LLC, (30) Paragon Mortgage Bankers Corp., (31) Parkview Financial Center, Inc., (32) Delshah Capital, LLC, (33) Gregory Holland, (34) Ted Doumazios, (35) Annette Apergis, (36) Georgia Kontogiannis, (37) Carmine Cuomo, (38) Chloe Kontogiannis, (39) Anthony Focarile, (40) Joseph Jefferies El, (41) Michael Ricardo Toppin, (42) Franco Vitellozzi, (43) Sandy Abreu, (44) Elbido Tavarez, (45) Wilson Tavarez, (46) Aris Fontis, (47) Celestine Miller, (48) William Harris, (49) George Proios, (50) Gerald P. Dougal, (51) Steve Brown, (52) Thomas Cusack, (53) Mark Gallan, (54) Agatha Luka, (55) Stephen Martini, and (56) John T. Michael.  The original nine defendants are also listed in the Amended Complaint.

Complaint includes one of the two new plaintiffs[4] and 49 of the 56 new defendants named in the body of the document; the parties' names, however, are listed in a different order than in the original caption.

From March 2019 through November 2019, plaintiffs moved to amend the caption and/or the Amended Complaint several times and also moved for a preliminary injunction.  *See* Mot. for Leave to Amend Caption filed Mar. 14, 2019, Dkt. 22; Mot. for Leave to Amend Caption with Signature Page filed Mar. 21, 2019, Dkt. 29; Mot. for Prelim. Inj., Dkt. 38; Mot. for Leave to Amend Caption filed Aug. 29, 2019, Dkt. 62[5]; Mot. for Leave to Amend Complaint to Correct Jurisdictional Defects filed Sept. 19, 2019, Dkt. 68; Mot. for Leave to Amend Caption filed Nov. 6, 2019, Dkt. 88.  In response to the Amended Complaint and these motions filed by plaintiffs, defendants North Shore, Weinreb, Kondaur, Fidelity Title, Chicago Title, 609 Emerald Street (collectively, "appearing defendants") and interested party Stewart Title Insurance Company ("Stewart Title"),[6] by various separate filings, moved to dismiss the Amended Complaint for, as relevant here, lack of subject matter jurisdiction, failure to state a claim, and/or expiration of the statute of limitations.  *See* North Shore's & Weinreb's Mot. to Dismiss, Dkt. 24; Kondaur's Mot.

---

[4]  George Wagner is not listed in the caption but is listed in the body of the Amended Complaint.  Am. Compl. at 17.

[5]  In this motion, plaintiffs sought to remove plaintiff Roger Wagner as a party-plaintiff and add Fred Harry, Alcides Hoy, Carnol Joseph, Chener Joseph, Darrell Haynes, Eugene Ikhihibhojere, Franco Jaramillo, Radhica Hanarain (another name for "Radhica Parsaram"), Gary Livinstone, Hasan Shafiq, Idris Mojeed, Isaura Diaz, Juan Nunez, Juan Quijije, Quincy Liverpool, Than Singh, Tonya Quinnonez, and Helen "____" as party-plaintiffs.  Plaintiffs also sought an extension of time to add 17 "integral complaints detailing the action of the defendants with particularity to each plaintiff" and notified the Court of their intent to "amend the relief requested to accommodate the relief for the additional plaintiffs" and to add institutional plaintiffs.  Mot. for Leave to Amend Caption filed Aug. 29, 2019 at 3.  In light of the recommendations set forth below, I do not address this request to include additional plaintiffs.

[6]  Stewart Title is not named as a defendant in the original Complaint.  Plaintiffs seek to add Stewart Title as a party-defendant in their motion to amend the caption filed March 14, 2019.  Stewart Title is listed as an "interested party" on ECF.

to Dismiss, Dkt. 33; Chicago Title's & Fidelity Title's Mot. to Dismiss, Dkt. 57; Stewart Title's

Mot. to Dismiss, Dkt. 80; 609 Emerald Street's Letter, Dkt. 83.

In response to plaintiffs' multiple filings, Judge Brodie directed plaintiffs on two

occasions to "refrain from filing any additional motions until the Court has ruled on all motions

currently before the Court." Order dated Sept. 23, 2019; Order dated Nov. 14, 2019. Judge

Brodie then referred the various pending motions to me for Report and Recommendation. Order

Referring Mots. dated Nov. 14, 2019.

After the motions were referred to me, I scheduled an in-person status conference for

January 2, 2020 and directed all plaintiffs and counsel for defendants to appear. Order dated

Dec. 9, 2019. Although defendants served plaintiffs with the scheduling order, none appeared at

the conference, which proceeded in their absence. Min. Entry dated Jan. 2, 2020, Dkt. 104. I

expressed some preliminary views about the pending motions during the conference and

provided defendants an opportunity to submit letters in response to those views. Following the

filing of the transcript of the proceedings on January 3, 2020, Tr., Dkt. 103, I entered an Order

affording plaintiffs the opportunity to submit a response as well, and directing them to do so by

January 15, 2020. Order dated Jan. 3, 2020.

Plaintiffs submitted a letter dated December 30, 2019 that was filed on January 2, 2020.

Letter dated Dec. 30, 2019, Dkt. 106. In their letter, plaintiffs sought a stay for 90 days while

they "put[] together a legal team." I denied plaintiffs' application to stay the case, with leave to

renew if counsel promptly appeared on plaintiffs' behalf and sought a reasonable period of time

to become familiar with the details of the case. Order dated Jan. 7, 2020. No attorney has since

appeared on plaintiffs' behalf or indicated any intention of doing so.

Stewart Title filed a letter in response to the matters discussed at the conference, asserting

that plaintiffs' contract and RICO claims should be dismissed as time-barred and that the fraud

claims should be dismissed on the ground that plaintiffs have not suffered any injury.  Letter

dated Jan. 7, 2020, Dkt. 107.  On January 13, 2020, plaintiffs filed a document titled "Motion in

Response to Conference Held on January 2, 2020," opposing dismissal of their Amended

Complaint.  Mot. in Response to Conference, Dkt. 109.

     For the reasons stated below, I respectfully recommend that plaintiffs' various motions be

denied, that defendants' motions to dismiss be granted, that plaintiffs' RICO claim be dismissed

with prejudice as to all defendants named and sought to be named by plaintiffs, and that

plaintiffs' state law claims be dismissed without prejudice.  I further respectfully recommend that

plaintiffs not be afforded another opportunity to amend their complaint and that the action be

dismissed in its entirety.

**FACTS**

     Except where otherwise specifically indicated, the facts set forth below are drawn

generally from plaintiffs' original Complaint, Amended Complaint, and the various motions

made by plaintiffs now pending before the Court.  More precise citations are in several instances

not provided in the interest of simplicity because of the length of plaintiffs' submissions and

because the facts recounted below are in some instances distilled from the numerous submissions

plaintiffs have made.

     Between 2006 and 2008, plaintiffs each purchased property in a subdivision known as

Loring Estates in Brooklyn, New York.  Am. Compl. at 16–17; Compl. ¶ 24; Mem. & Order

dated May 18, 2018 at 2.[7]  Plaintiffs' claims arise from the criminal conviction of Thomas

---

[7]  The Amended Complaint alleges that Roger Wagner purchased the property located at 440 Amber Street in 2006.
Am. Compl. at 17.  However, according to the Automated City Register Information System ("ACRIS") website,
Wagner's deed and mortgage for this property were filed in 2008.

Kontogiannis, the developer of Loring Estates.  In 2011, Kontogiannis was convicted in the

Eastern District of New York of conspiracy to commit bank fraud and wire fraud in violation of

18 U.S.C. § 1349.  Kontogiannis Guilty Plea in *United States v. Kontogiannis*, 09-CR-360, Aff.

of David J. Wolkenstein in Supp. of Chicago Title's & Fidelity Title's Mot. to Dismiss

("Wolkenstein Aff."), Ex. 5, Dkt. 58-5.

 The facts involving Kontogiannis's fraudulent scheme are detailed in his 2009

indictment.  Indictment ("Ind."), Wolkenstein Aff., Ex. 1, Dkt. 58-1.  Insofar as relevant here, the

indictment alleges that Kontogiannis acquired the land where Loring Estates would later be built

in 2002 and 2003.  *Id.* ¶ 3.  He then directed family, friends, and employees to submit false

mortgage loan applications in connection with purported purchases of various Loring Estates

properties.  *Id.* ¶ 19.  These applications were designed to create the appearance that the loan

applicants were bona fide purchasers and were qualified to obtain the loans they were seeking.

*Id.* ¶ 21.  Coastal Capital or CIP Mortgage Corporation, mortgage lenders controlled by

Kontogiannis, approved these loan applications.  *Id.* ¶¶ 20, 21.  At sham closings, the parties

involved in the scheme prepared and executed phony closing documents, including mortgage

applications, title reports, and appraisals.  *Id.* ¶ 17.  Many of the deeds and mortgages, though,

were never recorded.  *Id.* ¶ 22.  The mortgage loans made by Coastal Capital and CIP Mortgage

Corporation were then sold to investors in the secondary mortgage market, including

Washington Mutual Bank, Inc. ("Washington Mutual") and DLJ Mortgage Capital, Inc. ("DLJ

Mortgage Capital"), a subsidiary of Credit Suisse U.S.A., Inc.  *Id.* ¶¶ 14–15, 27.  Kontogiannis

used the funds from the sales in the secondary mortgage market to finance construction in Loring

Estates, among other projects, and to enrich himself and his family.  *Id.* ¶ 18.

 Kontogiannis and his co-defendants defrauded Washington Mutual and DLJ Mortgage

Capital of nearly $100 million.  In a letter submitted in connection with Kontogiannis's

sentencing, the government summarized his fraudulent scheme as follows:

> Kontogiannis was a real estate developer who engineered a massive
> mortgage fraud scheme whereby he staged sales of homes in order
> to reap the mortgage proceeds.  Some of the homes were not yet
> built. Most of the homes were sold repeatedly, which was
> accomplished by failing to record the mortgages and deeds.  Toward
> the end of the scheme, Kontogiannis sold the homes to legitimate
> third parties (meaning, individuals unrelated to Kontogiannis who
> simply wanted to purchase a home).  The mortgages and deeds for
> the sales to third parties were recorded, but the lenders who financed
> this sale were not told about the prior liens and had no way of
> learning about them.  This final sale meant that the investors who
> purchased the prior mortgages (DLJ Mortgage ("DLJ") and
> Washington Mutual Bank ("WAMU")) would have no collateral on
> which to foreclose.  In all, DLJ and WAMU were left with over $92
> million in unrecoverable mortgage loans.

Sentencing Memorandum dated May 25, 2011 ("Sent. Mem."), at 1, Dkt. 161 in *United States v.*

*Kontogiannis*, 09-CR-360 (KAM).

Many of the Loring Estate properties, which were three-family residential homes, were

resold to others, including plaintiffs.  Plaintiffs' claims in this action arise from their purchases

of Loring Estate homes and essentially fall into two categories.

First, plaintiffs allege that they are victims of the fraudulent scheme perpetrated by

Kontogiannis because they acquired property with clouded title.  More specifically, plaintiffs

allege that their titles are clouded by the prior mortgages taken out by Kontogiannis's associates,

and that the title insurance policies they were issued in connection with their purchases are

fraudulent.  Plaintiffs, however, are not identified in the indictment as having been defrauded by

Kontogiannis, and it is unclear how, if at all, the scheme could have impacted them.  As

indicated in the government's sentencing memorandum, the victims of Kontogiannis's scheme

were the investors who paid $92 million for the fraudulently obtained mortgage loans but who

were left with "no collateral on which to foreclose."  In other words, the investors victimized by Kontogiannis's scheme had no legal interest in the properties ultimately sold to plaintiffs, who obtained their mortgage loans from entities other than those Kontogiannis defrauded or those he used in furtherance of his scheme.[8]

Second, plaintiffs Stewart, Parsaram, Castro, Roger Wagner, George Wagner, Carrington, Wells, Clark, Dorset, and Harry allege that, although they contracted to purchase fully constructed residences, they learned at their closings that construction was incomplete and that no certificates of occupancy ("COs") had been issued for their homes.[9]  Plaintiffs allege that, following their closings, they were required to perform their own repairs before they could either live in or rent out their properties.

Based on these facts, plaintiffs asserted claims of breach of contract and fraud in their original Complaint.  Mem. & Order dated May 18, 2018 at 2.  In their Amended Complaint, plaintiffs attempt to allege a RICO violation, presumably in response to the Court's order dismissing their original Complaint for lack of diversity jurisdiction.  Although the Amended Complaint does not explicitly allege each of the elements of a RICO claim, it does contend that

> defendants conspired and acted together in concert as a vast criminal enterprise headed [by] Thomas Kontogiannis to defraud . . . plaintiffs, by selling them newly constructed three-family homes, that were encumbered such that . . . plaintiffs and other initial purchasers were paying mortgages "concurrently" with other parties

---

[8]  Several of the properties purchased by plaintiffs were subject to foreclosure proceedings initiated by plaintiffs' lenders during the ensuing several years.  *See, e.g.*, *HSBC Bank, USA, Nat'l v. Radhica Parsaram*, Index No. 508897/2016 (Sup. Ct., Kings County); *Wells Fargo Bank, N.A. v. Roger Wagner*, Index No. 510220/2014 (Sup. Ct., Kings County); *Federal National Mortgage v. Rafael Castro*, Index No. 507460/2014 (Sup. Ct., Kings County); *U.S. Bank Nat'l v. Fred Harry*, Index No. 507310/2014 (Sup. Ct., Kings County); *JPMorgan Chase Bank v. Roger Wagner*, Index No. 19707/2012 (Sup. Ct., Kings County); *Chase Home Finance LLC v. Rafael Castro*, Index No. 11600/2010 (Sup. Ct., Kings County); and *Option One Mortgage v. Hazel Clarke*, Index No. 14903/2008 (Sup. Ct., Kings County).

[9]  Plaintiff Dyer alleges that, in 2005, he signed a purchase agreement and made a down payment for the property located at 1429 Stanley Avenue, Brooklyn, N.Y. 11208.  Am Compl. at 345–47.  He also alleges that the closing never took place, but that his down payment was never returned.  *Id.*

unknown to them, for the same property.

Am. Compl. at 154.  The Amended Complaint further alleges that the enterprise engaged in a

pattern racketeering activity including wire fraud, mail fraud, and money laundering.  *See* Am.

Compl. at 5–6.  The Amended Complaint also alleges multiple counts of fraud, presumably

under New York common law.  Am. Compl. at 483–579.

DISCUSSION

## I.  STANDARD OF REVIEW

Where, as here, plaintiffs are proceeding *pro se*, their complaint is "held to less stringent

standards than formal pleadings drafted by lawyers."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)

(internal quotation marks and citation omitted).  If a liberal reading of the complaint "gives any

indication that a valid claim might be stated," the court "should not dismiss without granting

leave to amend at least once."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal

quotation marks and citations omitted).

## II.  MOTIONS TO DISMISS

In their motions to dismiss the Amended Complaint, appearing defendants and Stewart

Title assert a lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and/or a failure to state

a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.  *See*, *e.g.*, North Shore's & Weinreb's Mem. of Law in Supp. of Mot. to Dismiss,

Dkt. 25 (noting also that plaintiff Stewart was held to have defaulted in a state court foreclosure

action and invoking the *Rooker-Feldman* doctrine and claim preclusion in support of their

motion to dismiss); Kondaur's Mem. of Law in Supp. of Mot. to Dismiss, Dkt. 35 (same);

Chicago Title's & Fidelity Title's Mem. of Law in Supp. of Mot. to Dismiss, Dkt. 59; Stewart

Title's Mem. of Law in Supp. of Mot. to Dismiss, Dkt. 80-13; 609 Emerald Street's Letter, Dkt.

83.

Where, as here, the court is faced with motions to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6), the court "must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction." *Magee v. Nassau Cty. Med. Ctr.*, 27 F. Supp. 2d 154, 158 (E.D.N.Y. 1998).

### A.  Motion to Dismiss Pursuant to Rule 12(b)(1)

"[F]ederal courts are courts of limited jurisdiction."  *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) (internal quotation marks and citation omitted).  Generally speaking, pursuant to Article III of the Constitution, federal courts have jurisdiction to hear only those cases in which a claim raises a federal question or where the parties are completely diverse and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. §§ 1331, 1332; *Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 136 (2d Cir. 2002).  "[F]ailure of subject matter jurisdiction is not waivable and may be raised at any time by a party or by the court *sua sponte* ["on its own accord"].  If subject matter jurisdiction is lacking, the action must be dismissed." *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700–01 (2d Cir. 2000).

### 1.  Federal Question Jurisdiction

Plaintiffs invoke the Court's federal question jurisdiction.  Federal question jurisdiction is available when a plaintiff brings a claim "arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  The Amended Complaint appears to assert a violation of the RICO statute, 18 U.S.C. § 1964(c).  Am. Compl. at 5–6.  While, as discussed below, I conclude that plaintiffs' RICO claim is subject to dismissal, plaintiffs' failure to plead a viable RICO

claim is not fatal to their invocation of federal question jurisdiction.

"Whether a federal court possesses federal-question subject matter jurisdiction and whether a plaintiff can state a claim for relief under a federal statute are two questions that are easily, and often, confused." *Carlson v. Principal Fin. Grp.*, 320 F.3d 301, 305–06 (2d Cir. 2003). "The cause of this confusion is understandable" because "the very statute that creates the cause of action often confers jurisdiction as well—that is, the claim 'arises under' the same federal law that gives the plaintiff a cause of action." *Id.* at 306 (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)). The "more-than-occasional difficulties involved in parsing a claim alleging federal question jurisdiction to determine whether it fails to state a claim or fails to meet jurisdictional requirements" has led to "a general practice of granting jurisdiction in most cases and dismissing for lack of subject matter jurisdiction only under narrow circumstances." *Nowak*, 81 F.3d at 1188.

Generally, a complaint brought under a federal statute "may not be dismissed for lack of jurisdiction unless it appears that the claim is patently frivolous or wholly insubstantial"; the test is "whether the complaint on its face, without resort to extraneous matter, is so plainly insubstantial as to be devoid of any merits and thus not presenting any issue worthy of adjudication." *Giulini v. Blessing*, 654 F.2d 189, 192 (2d Cir. 1981); *see also Bell v. Hood*, 327 U.S. 678, 682–83 (1946). It bears noting, though, that "[a] federal claim is not 'insubstantial' merely because it might ultimately be unsuccessful on its merits." *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 133 (2d Cir. 2010). Rather, if the complaint asserts "a substantial claim under an act of Congress, there is jurisdiction whether the claim ultimately be held good or bad." *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913). Accordingly, when reviewing a motion to dismiss based on Rule 12(b)(1) and Rule 12(b)(6), the

court asks "whether—on its face—the complaint is drawn so as to seek recovery under federal law or the Constitution," and if so, the court then assumes "a sufficient basis for jurisdiction, and reserve[s] further scrutiny for an inquiry on the merits." *Nowak*, 81 F.3d at 1189.

In evaluating a motion to dismiss under Rule 12(b)(1), the court "accept[s] as true all material factual allegations in the complaint." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). However, "inferences favorable to the party asserting jurisdiction should not be drawn." *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992). Rather, "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists," and must make that showing "affirmatively, and . . . not . . . by drawing [favorable inferences] from the pleadings." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks and citations omitted), *aff'd*, 561 U.S. 247 (2010); *see also Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

Here, the Amended Complaint plainly states in its jurisdiction section that "[t]he Kontogiannis enterprise engaged in racketeering activity that violated three RICO predicate statutes: 18 U.S.C. § 1343, the wire fraud statute; 18 U.S.C. § 1341, the mail fraud statute; and 18 U.S.C. § 1956, the money laundering statute." Am. Compl. at 5–6.[10] Although plaintiffs do not identify specific acts as constituting wire or mail fraud, they do repeatedly allege that the closing documents, including the deeds and title policies, for each of the relevant transactions involving plaintiffs were fraudulently designed and/or submitted to various entities and that

---

[10]  In the proposed Amended Complaint attached to their September 19, 2019 motion, plaintiffs also invoke federal question jurisdiction based on claims brought under RICO and the Fourth and Fifth Amendments of the U.S. Constitution.  Proposed Am. Compl. Excerpt at 4–5, Dkt. 68-2.  Plaintiffs nowhere explain the factual basis for their purported constitutional claims, and I therefore do not specifically address them in this Report.

certain proceeds from the transactions were fraudulently transferred.  As for their allegation of money laundering, plaintiffs allege that "Thomas Kontogiannis'[s] admissions . . . directly implicate the other [c]onspirators and the entire Kontogiannis Enterprise, which not only stole hundreds of millions of dollars, but laundered the ill-gotten gains through a myriad of legitimate and illegitimate businesses located nationally and internationally."  *Id.* at 245.

Stewart Title points out that "[p]laintiffs actually label each cause of action in their Amended Complaint as a fraud claim," and that plaintiffs' short statement regarding violations of 18 U.S.C. §§ 1341, 1343, and 1956 on pages five and six of their Amended Complaint does not, without more, "transform [p]laintiffs' fraud claim[s] under New York law into a federal RICO claim."  Stewart Title's Mem. of Law in Supp. of Mot. to Dismiss at 9–10.  Moreover, Stewart Title asserts that the Amended Complaint nowhere alleges that defendants violated 18 U.S.C. § 1962, the substantive RICO statute, or "the existence of an enterprise that is distinct from the alleged racketeering activity."  *Id.* at 11.  Defendants Chicago Title and Fidelity Title similarly assert that none of plaintiffs' "six causes of action advance a RICO claim pursuant to 18 U.S.C. §§ 1961 and 1962, nor a federal claim pursuant to 18 U.S.C. §§ 1341, 1343, [and] 1956."  Chicago Title's & Fidelity Title's Mem. of Law in Supp. of Mot. to Dismiss at 9.  Chicago Title and Fidelity Title argue further that plaintiffs fail to plead the elements of a RICO claim and that any allegations plaintiffs do make "lack the . . . particularity" required for a RICO claim.  *Id.* at 11.[11]

The original Complaint did not assert a RICO claim; rather, plaintiffs assert their RICO claim for the first time in the Amended Complaint they filed after Judge Brodie's May 2018

_____

[11]  North Shore's and Weinreb's arguments with respect to subject matter jurisdiction are limited to diversity jurisdiction.

Order holding that diversity jurisdiction was lacking.  Defendants' contention that plaintiffs' factual allegations in support of their RICO claims are insufficient to meet the heightened pleading standard of Fed.R.Civ.P. 9(b) is likely correct.  *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) ("[A]ll allegations of fraudulent predicate acts . . . are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).").  Moreover, as discussed below, I conclude that plaintiffs have failed to state a RICO injury, and that their RICO claim should therefore be dismissed.  However, that plaintiffs' RICO claim "might ultimately be unsuccessful on its merits" does not mean the claim is "wholly insubstantial" and "frivolous" or that a dismissal of the action on grounds of subject matter jurisdiction is warranted.  *S. New England Tel. Co.*, 624 F.3d at 133 (internal quotation marks and citation omitted); *see generally Davis v. Yeroushalmi*, 985 F. Supp. 2d 349, 357–58 (E.D.N.Y. 2013).

The Amended Complaint "is drawn so as to seek recovery under" the RICO statute. *Nowak*, 81 F.3d at 1189.  Although plaintiffs' Amended Complaint does not cite 18 U.S.C. § 1962—the substantive RICO statute—it does explicitly refer to money laundering, wire fraud, and mail fraud as RICO predicates.  Moreover, plaintiffs have at least implicitly asserted that defendants comprised an enterprise, the purpose of which was to finance construction in Loring Estates, among other projects, and to enrich its members, by acquiring money through a pattern of fraudulent activity.  *See Davis*, 985 F. Supp. 2d at 358 (holding that if a complaint "on its face—is drawn to seek recovery under federal law" and contains allegations that defendants comprised an enterprise that deprived plaintiff of property through a pattern of robbery and fraud, it is sufficient to provide a basis for invoking federal question jurisdiction even though its "conclusory allegations are insufficient to rise to the level of plausibility required under *Iqbal*

14

and *Twombly*"); *cf. Holmes v. Parade Place, LLC*, 2013 WL 5405541, at *8 (S.D.N.Y. Sept. 26, 2013 (dismissing case for lack of subject matter jurisdiction only after noting that plaintiff made "no mention at all of racketeering, mail fraud, or any other conduct that, on its face, implicates a federal claim"); *Rodriguez v. Jaddie Stewart Agency Inc.*, 2009 WL 212123, at *6 (E.D.N.Y. Jan. 28, 2009) (holding that "the purported RICO claim does not provide a basis for federal court jurisdiction" because it "is a blatant effort by plaintiff to create federal jurisdiction where none exists"). Accordingly, I conclude that the Amended Complaint, because it is drawn on its face to seek recovery under federal law, is sufficient to support this Court's exercise of its federal question jurisdiction.

## 2. *Diversity Jurisdiction*

Plaintiffs also invoke diversity jurisdiction. Am. Compl. at 5. District courts have diversity jurisdiction where, assuming the requisite amount in controversy, the suit is between "citizens of different States." 28 U.S.C. § 1332(a)(1). Complete diversity of citizenship is required; "[t]hat is, diversity jurisdiction does not exist unless *each* defendant is a citizen of a different State from *each* plaintiff." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978) (emphasis in original); *see also St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80 (2d Cir. 2005). For purposes of diversity jurisdiction, a corporation takes the citizenship of its state of incorporation and the state where it has its principal place of business. *See* 28 U.S.C. § 1332(c)(1).

Judge Brodie has already found complete diversity of citizenship lacking because it appeared that all plaintiffs and all but one of the nine original defendants were citizens of New York. Mem. & Order dated May 18, 2018 at 5. Here, although not all of the defendants named in the original Complaint are listed in the Amended Complaint's caption, the caption lists most

of them, and the body of the Amended Complaint lists all of them.[12]  Moreover, the body of the Amended Complaint identifies many of the newly added defendants as having their principal place of business or residence in New York.  Am. Compl. at 26–35.  Therefore, there is an absence of complete diversity, and diversity jurisdiction is not available.

Plaintiffs assert that their various submissions from March 2019 through November 2019 were "meant to supplant and replace earlier pleadings."  Mot. in Response to Conference at 2.  However, plaintiffs' submissions are difficult to comprehend and poorly organized, making it unclear as to whether plaintiffs still intend on pursuing claims against most or only some of the defendants listed in the Amended Complaint.[13]  Moreover, some of these subsequent filings continue to name New York defendants, but as third-party defendants.  Having named these New York parties in their pleadings and other submissions, plaintiffs cannot avoid the resulting lack of complete diversity by mislabeling them as third-party defendants.  Thus, I find that plaintiffs have not met their burden of establishing that diversity jurisdiction exists in this case.

### B.  Motion to Dismiss Pursuant to Rule 12(b)(6)

A complaint may survive a motion to dismiss brought under Rule 12(b)(6) only if it includes "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

---

[12]  The caption of the Amended Complaint appears to list each defendant named in the original Complaint except for PI-NC and 609 Emerald Street.  These entities are, however, named as defendants in the body of the pleading.  Am. Compl. at 29–30.

[13]  In plaintiffs' March 14, 2019 motion for leave to amend the caption, all nine original defendants are listed as third-party defendants.  In plaintiffs' August 29, 2019 and September 19, 2019 motions, plaintiffs list in the caption only Washington Title Insurance Company, Chicago Title, Fidelity Title, United General Insurance Company, Stewart Title, and the IRS as defendants and N.Y.C. Department of Buildings, Triumph Abstract, LLC, and Lorenzo Deluca as third-party defendants.  However, in the Amended Complaint excerpt attached to the September 19, 2019 motion, plaintiffs provide a list of defendants in a "Table of Contents" section exceeding what was listed in the caption.  Am. Compl. Excerpt, Dkt. 68-2.  In plaintiffs' November 6, 2019 motion to amend the caption, the N.Y.C. Department of Buildings and Triumph Abstract, LLC are removed from the caption.

U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  In contrast, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

When considering a motion under Rule 12(b)(6), a court may generally "look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). However, "[i]n certain circumstances, the court may . . . consider documents other than the complaint," *id.*, such as "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).  Where, as here, a case concerns real property located in the City of New York, the Court may take judicial notice of and consider public documents relating to the real property at issue, such as those available at the Automated City Register Information System ("ACRIS") website.  *See Jackson v. Wells Fargo Home Mortg.*, 2018 WL 8369422, at *1 n. 3 (E.D.N.Y. Aug. 10, 2018), *report and recommendation adopted*, 2019 WL 1376840 (E.D.N.Y. Mar. 27, 2019); *Cummins v. Select Portfolio Servicing, Inc.*, 2016 WL 4766237, at *1 n. 2 (E.D.N.Y. Sept. 13, 2016).  The Court may also "take judicial notice of filings in state or federal court," *Purjes v. Plausteiner*, 2016 WL 552959, at *4 (S.D.N.Y. Feb. 10, 2016), and "of news articles discussing the conduct raised in the complaint," *In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d 391, 397 (S.D.N.Y. 2011).

Claims are also subject to dismissal under Rule 12(b)(6) if it is clear from the complaint that they are untimely.  *See, e.g., Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("Dismissal under Fed.R.Civ.P. 12(b)(6) is appropriate when a defendant raises . . . [a

statutory bar] as an affirmative defense and it is clear from the face of the complaint, *and matters of which the court may take judicial notice*, that the plaintiff's claims are barred as a matter of law." (emphasis in original; internal quotation marks and citation omitted)).

### 1. RICO Claim

Although part of Title 18 of the United States Code, RICO provides for a private right of action, as follows:

> Any person injured in his [or her] business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he [or she] sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c).  A plaintiff asserting a RICO claim must plausibly allege "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962."  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (internal quotation marks and citations omitted).  "To show that an injury resulted by reason of the defendant's action, a plaintiff must show that the defendant's violations were a proximate cause of the plaintiff's injury, i.e., that there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct."  *DeFalco v. Bernas*, 244 F.3d 286, 329 (2d Cir. 2001) (internal quotation marks and citations omitted).  Because I conclude that the Amended Complaint fails to plausibly allege any injury that is not time-barred, I do not consider whether plaintiffs have alleged facts sufficient to satisfy the first and third elements required to state a RICO claim.

As discussed above, plaintiffs' claims of injury fall essentially into two categories.  First, plaintiffs contend that the titles to their Loring Estates homes are clouded by the prior mortgages taken out by Kontogiannis's associates as part of the fraudulent scheme for which Kontogiannis

was convicted, and that the title insurance policies issued to them when they purchased their homes are fraudulent.  Second, plaintiffs Stewart, Parsaram, Castro, Roger Wagner, George Wagner, Carrington, Wells, Clark, Dorset, and Harry allege that they learned at the closings on their purchases of Loring Estates properties that construction of their homes had not been completed and that COs for their homes had not been issued.  These plaintiffs allege that, as a result, they were forced to perform repairs on their newly purchased homes before they could live in or rent them.

If, as alleged, plaintiffs were sold homes that were not properly or completely constructed, or without COs, they no doubt suffered an injury to their property.  However, as discussed below, any claims based on that injury are plainly time-barred.  With respect to their claims that their titles are clouded as a result of the mortgage loans taken out by Kontogiannis and his associates as part of their fraudulent scheme, or that their title policies are fraudulent, plaintiffs have failed to plausibly allege that they have sustained any resulting injury.  Moreover, even if they had, these claims would be time-barred as well.

Kontogiannis's fraudulent scheme involved arranging for friends and family members to make false mortgage loan applications in connection with purported purchases of various Loring Estates properties; conducting sham closings with phony closing documents, including mortgages, notes, deeds, and appraisals; failing to record the mortgages; and then selling the unrecorded mortgages to unwitting investors.  Plaintiffs contend that they sustained injuries in the form of clouds on their title as a result of Kontogiannis's use of their properties in furtherance of his fraudulent mortgage loan scheme.  The Amended Complaint includes allegations that plaintiffs are as a result unable to sell their properties.  Plaintiffs have not, however, submitted any relevant public documents that would reveal the existence and nature of

19

any liens on their properties resulting from Kontogiannis's fraudulent scheme.

Indeed, the victims of the scheme perpetrated by Kontogiannis were not the individuals who purchased homes at Loring Estates; rather, the victims were the investors who paid to acquire mortgages and, in the words of the government's sentencing memorandum, "ha[d] no collateral on which to foreclose." Sent. Mem. at 1. Thus, at least according to the government, the mortgages sold as part of Kontogiannis's scheme were fraudulent precisely because they failed to provide the investor mortgagees with any collateral at all, a contention directly at odds with plaintiffs' claims that those mortgages operated as liens clouding plaintiffs' titles to their properties.

Publicly available records confirm that plaintiffs' titles have not been compromised or otherwise affected by Kontogiannis's fraud. As discussed above, the Court may take judicial notice of public documents available at the ACRIS website. *See Jackson*, 2018 WL 8369422, at *1 n.3. The ACRIS records indicate that none of the mortgages taken out by Kontogiannis or his associates are recorded as liens on any of plaintiffs' properties.[14] As a result, these mortgage liens are, for all practical purposes, void, and cannot encumber plaintiffs' titles to their homes. "Under New York law, an unrecorded mortgage on a given piece of real property is void as against any lien on the same real property that is recorded in good faith." *United States v. Turk*, 626 F.3d 743, 748 (2d Cir. 2010); *see also Hudson Valley Fed. Credit Union v. N.Y. State Dep't of Taxation and Fin.*, 28 Misc. 3d 1001, 1007 (Sup. Ct., New York Cty. 2010) (noting that "unless a mortgage is recorded, it may not be enforced in a court of law or foreclosed upon"), *aff'd* 85 A.D.3d 415 (1st Dep't 2011), *aff'd as modified* 20 N.Y.3d 1 (2012). Thus, the

---

[14]  Neither Coastal Capital nor CIP Mortgage Corporation—the two mortgage lenders controlled by Kontogiannis—is listed on ACRIS for any of plaintiffs' properties. The earliest transactions listed on ACRIS for each property are those relating to plaintiffs' purchases. In other words, there are no recorded liens that predate plaintiffs' acquisitions of each property.

mortgages involved in Kontogiannis's scheme, never having been recorded, can in no way impede plaintiffs' ability to sell or borrow against their homes; they would have no effect on any attempt by a plaintiff to obtain a second mortgage or by a potential purchaser of a plaintiff's home to obtain mortgage financing.

It is therefore not surprising that, although plaintiffs allege in a conclusory manner that they cannot sell their properties due to their "un-insurable" titles, Mot. in Response to Conference at 10, they do not identify any specific transactions that were aborted because of the mortgages involved in Kontogiannis's scheme or any other cloud on their title. Nor do plaintiffs contend that any lenders other than those from whom they themselves obtained mortgage loans have sought payments from them or attempted to hold them in default on any note or foreclose on any of their properties. In short, plaintiffs have failed to allege that they have suffered any injury to their title in their homes as a result of Kontogiannis's scheme. Moreover, in light of the indications in the ACRIS records that none of the Kontogiannis mortgages were recorded as liens against any of plaintiffs' properties, any contention of injury would not be plausible.

### 2. *Statute of Limitations*

Chicago Title, Fidelity Title, and Stewart Title not only argue that plaintiffs' allegations in the Amended Complaint are insufficient to give rise to a plausible RICO claim, but also that the purported RICO claim is time-barred. Chicago Title's & Fidelity Title's Mem. of Law in Supp. of Mot. to Dismiss at 11–13; Stewart Title's Mem. of Law in Supp. of Mot. to Dismiss at 14–15.

"RICO claims are subject to a four-year statute of limitations." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012). This "four-year statute of limitations 'begins to run [on a RICO claim] when the plaintiff discovers—or should have reasonably discovered—the alleged injury.'" *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 328 F. Appx. 695, 697 (2d Cir. 2009)

(quoting *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 233 (2d Cir. 2008)).  "A plaintiff should discover an injury if there are sufficient 'storm warnings' of the wrongful conduct forming the basis of the plaintiff's claims."  *Marshall v. Milberg LLP*, 2009 WL 5177975, at *3 (S.D.N.Y. Dec. 23, 2009).  "Whether a plaintiff has such 'inquiry notice' or 'constructive notice' is judged under an objective standard and requires an evaluation of the totality of the circumstances."  *Id.* (quoting *Staehr*, 547 F.3d at 427).

Critically, inquiry notice or storm warnings "need not detail every aspect of the alleged fraudulent scheme."  *Koch*, 699 F.3d at 151 (internal quotation marks and citation omitted).  Rather, "storm warnings are sufficient where . . . a person of ordinary intelligence would consider it probable that fraud had occurred."  *Id.* (internal quotation marks and citation omitted).  "Even a single news article can place a plaintiff on inquiry notice."  *Marshall*, 2009 WL 5177975, at *4; *see In re MBIA Inc.*, 2007 WL 473708, at *6–*7 (S.D.N.Y. Feb. 14, 2007) (collecting cases).  "Although generic news articles describing the opportunity for wrongful conduct do not create a duty of inquiry, articles that present evidence of actual wrongful conduct are sufficient."  *Marshall*, 2009 WL 5177975, at *4.  "Consequently, a news article that describes an allegation of wrongful conduct with a sufficient degree of specificity will impose a duty of inquiry."  *Id.*; *see In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 200 (S.D.N.Y. 2003) (finding that one article constituted a "storm warning" because it "did not merely indicate general financial difficulties . . . rather, it laid out in detail precisely the transactions at the heart of plaintiffs' allegations of accounting fraud").

While a court "may determine as a matter of law whether inquiry notice existed in a particular case, it should not dismiss a complaint on this basis unless uncontroverted evidence clearly supports such a finding."  *Lorber v. Winston*, 962 F. Supp. 2d 419, 440 (E.D.N.Y. 2013)

22

(internal quotation marks and citations omitted).  "Accordingly, making this determination is frequently inappropriate on a motion to dismiss and is only proper . . . when the complaint and documents which the court may take notice of clearly show that the claims are barred as a matter of law."  *Id.* (internal quotation marks and citations omitted).

As discussed above, plaintiffs assert two types of injury: first, that the titles to their homes are clouded by the mortgages involved in Kontogiannis's fraudulent scheme, and second, that at the time certain plaintiffs closed on their home purchases, construction had not been completed and COs for their homes had not been issued.

As for these two alleged injuries, there were ample "storm warnings" sufficient to put plaintiffs on notice that a fraud had been perpetrated by Kontogiannis in connection with his real estate development business.  Kontogiannis was indicted together with eight others in 2009, entered a plea of guilty in 2010, and was sentenced to prison for nine years on charges of conspiracy to commit bank fraud and wire fraud in connection with Loring Estates and other properties.  *See* Ind.; Kontogiannis Guilty Plea.  News articles reporting on Kontogiannis's arrest and conviction, along with the arrests and convictions of several of the other defendants involved in the scheme, were published as long ago as 2009 by well-known news organizations, such as Reuters, the New York Post, and Newsday.[15]  Although these news articles do not specifically mention Loring Estates, they do generally state that the charged scheme involved properties that

---

[15]  *See*, *e.g.*, Post Staff Report, *Mtge. Fraudster*, NEW YORK POST (Oct. 6, 2011), https://nypost.com/2011/10/06/mtge-fraudster/; Jessica Dye, *Developer gets 9 years for $98 million mortgage fraud*, REUTERS (Oct. 5, 2011), https://www.reuters.com/article/us-newyork-kontogiannis/developer-gets-9-years-for-98-million-mortgage-fraud-idUSTRE7946NP20111005; Martha Graybow, *Nine accused of $92 million U.S. mortgage fraud scheme*, REUTERS (June 4, 2009), https://www reuters.com/article/us-mortgagefraud-indictments/nine-accused-of-92-million-u-s-mortgage-fraud-scheme-idUSTRE5534OL20090604; Kati Cornell Smith, *Jailed Financier Named in $92M Mortgage Fraud*, NEW YORK POST (June 4, 2009), https://nypost.com/2009/06/04/jailed-financier-named-in-92m-mortgage-fraud/; John Riley, *LI developer charged with mortgage fraud scheme*, NEWSDAY (June 4, 2009), https://www.newsday.com/long-island/crime/li-developer-charged-with-mortgage-fraud-scheme-1.1240606.

Kontogiannis developed and subdivided in Brooklyn and Queens.  It is reasonable to infer that plaintiffs would have recognized the name "Kontogiannis," as he was the developer of Loring Estates.

Moreover, plaintiffs themselves acknowledge in their Amended Complaint that they were aware that the homes they purchased were unfinished and lacking COs at the time of their closings, all of which took place between 2006 and 2008.  Am. Compl. at 252–55 (Stewart closing); 283–87 (Carrington closing); 300–07 (Clark closing); 316–23 (Dorset closing); 332–40 (Castro closing); 358–65, 378–86 (Parsaram closings); 421–29 (Harry closing); 441–49 (Roger Wagner closing); 462–471 (George Wagner & Roger Wagner closing).[16]  It is clear that plaintiffs knew that construction had not been completed and COs had not been issued when they purchased their homes.  It is also clear that press coverage of Kontogiannis's arrest, conviction and sentence provided storm warnings that would have caused a person of ordinary intelligence to consider it probable that a fraud had occurred, particularly when considered in connection with the incomplete construction and missing COs.[17]  I therefore conclude that plaintiffs reasonably should have discovered the fraud no later than 2011, the year Kontogiannis was convicted of conspiracy to commit bank fraud and wire fraud, and after plaintiffs had experienced various problems with their properties.  Because the Complaint was not filed until

---

[16]  The allegations with respect to each plaintiff are virtually identical.  In fact, the Amended Complaint contains what appear to be boilerplate paragraphs with a blank for the name of a specific plaintiff that, presumably inadvertently, was never filled in.  Am. Compl. at 399–407.

[17]  I take judicial notice of the news articles described above not for the truth of the matters reported in them but rather as evidence of storm warnings of the Kontogiannis fraudulent scheme.  *Staehr*, 547 F.3d at 425 ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice." (emphasis in original)).

April 18, 2018, plaintiffs' RICO claim is time-barred.[18]  I therefore respectfully recommend that

the appearing defendants' and Stewart Title's motions pursuant to Rule 12(b)(6) be granted, and

that the plaintiffs' RICO claim be dismissed with prejudice as to all defendants named and

sought to be named by plaintiffs.  Moreover, because the RICO claim is time-barred and, even if

timely, could not plausibly be asserted in light of the ACRIS records described above, I further

recommend that plaintiffs not be permitted yet another opportunity to amend their complaint.

### 3.  State Law Claims

Plaintiffs also allege contract and fraud claims under New York law.  District courts may

exercise "supplemental jurisdiction over all other claims that are so related to claims in the action

within such original jurisdiction that they form part of the same case or controversy."  28 U.S.C.

§ 1367(a).  However, the exercise of "[s]upplemental jurisdiction 'is a doctrine of discretion, not

of plaintiff's right.'"  *Heckmann v. Town of Hempstead*, 2013 WL 1345250, at *2 (E.D.N.Y.

Mar. 27, 2013) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).

Therefore, "[a] district court usually should decline the exercise of supplemental jurisdiction

when all federal claims have been dismissed at the pleading stage[.]"  *Denney v. Deutsche Bank*

*AG*, 443 F.3d 253, 266 (2d Cir. 2006)*; see also Lundy v. Catholic Health Sys. of Long Island*

*Inc.*, 711 F.3d 106, 118 (2d Cir. 2013) ("Once all federal claims have been dismissed, the

balance of factors will usually point toward a declination." (internal alterations, quotations, and

citation omitted)).

Because I recommend that plaintiffs' only federal claim be dismissed, I further respectfully

recommend that the Court decline to exercise supplemental jurisdiction over plaintiffs' state law

---

[18]  In 2017, plaintiff Stewart also commenced an action in New York Supreme Court, Kings County, against many of the same defendants sued in this action, alleging causes of action for breach of contract, fraudulent misrepresentation, negligent misrepresentation, and conspiracy to defraud.  Compl. in Index No. 17-2956, Dkt. 34-8. That action was ultimately dismissed.

claims against defendants, and that those claims instead be dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that plaintiffs' various motions be denied, that defendants' motions to dismiss be granted, that plaintiffs' RICO claim be dismissed with prejudice as to all defendants named and sought to be named by plaintiffs, and that plaintiffs' state law claims be dismissed without prejudice.  I further respectfully recommend that plaintiffs not be afforded another opportunity to amend their complaint and that the action be dismissed in its entirety.

Any objections to the recommendations made in this Report must be made within fourteen days after filing of this Report and Recommendation and, in any event, on or before March 11, 2020.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file timely objections may waive the right to appeal the District Court's order.  *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (discussing waiver under the former ten-day limit).

_____/s/_____

Steven M. Gold
United States Magistrate Judge

Brooklyn, New York
February 26, 2020

U:\#JAV 2019-2020\Stewart v. Loring Estates, 18-cv-02283\Final R&R.docx